May it please the court, Lewis and Barbone, Jacobson, Barbone, on behalf of Philip Ivey and Ching-Yung Sun. Good morning, Mr. President. Judge, I would also request to reserve five minutes for rebuttal. Granted. Your Honors, the defendants in this case argued at the time of the 12B6 motion in the very beginning in March of 2015 that there was illegality which prohibited the complaint to move forward. It is absolutely the law in New Jersey that all gambling is illegal, believe it or not. The statute is 2A40-1. Any wager, any bets, any gambling whatsoever is prohibited in the state of New Jersey. Yet there is an exception, and the exception under the New Jersey statute is the Casino Control Act. In fact, in the Casino Control Act, it is statute 5-12-124, and I submit that that statute lays out precisely what law is applicable for this case. In that statute, the... Let me just ask you just to clear up something that I think is clear from the record. The parties agree that there is a contract. Is that correct? Sort of. Well, explain that then, because it doesn't seem that that's what you're arguing. There were terms and conditions agreed by the parties at the get-go. In fact, in the beginning, in April of 2012, Phil Ivey and the Borgata spoke. There were five essential terms agreed for Phil Ivey's play. Those terms went to the conduct of the game itself. Phil Ivey requested only the use of eight decks of purple Jamaica playing cards. He requested a private pick. He requested the presence of a dealer that spoke Mandarin Chinese. So the requests made by Phil Ivey were all granted by the Borgata. To that extent, there was an agreement. Other than the agreement, and there were other terms. For example, the Borgata required that if you're coming to play and we're going to give you these terms and conditions, that play must be preceded by the deposit of front money. Why is your answer that there was sort of a contract? Can I finish first? It sounds like you're saying there was a contract, there was an offer, there was an acceptance, there was obviously an underlying consideration. So where's the sort of here? The only sort of comes in the fact that every time somebody walks into a casino or a gaming house and plays, there is a contract. But the contract is clearly one governed by the rules of the game. The contract is statutorily imposed and created. So the only real. The contract is statutorily imposed and created. I don't understand what you mean. Under the rules of the Casino Control Act, every game must be played pursuant to the rules of the division. And if it's not, there's a breach of contract. Yes. You argued in your brief in this case that to say that would be creating a private right of action under the Casino Control Act. Your brief said that it can't be that the rules are part of a contract or else you are saying there's a private right of action. That's in your brief. Now you're saying something different. You're saying that it is, that the rules are part of the contract so that there can be a breach of contract suit maintained. Respectfully, what I said in the brief was, with regard to whether or not there's a private cause of action, I argued, as the law has been clearly established, that if the breach we're talking about, if the violation is of the rules and regulations of the game, that is seeking a civil cause of action to vindicate a breach of the rules and regulations. But you don't disagree that the rules and regulations are a term of every contract. They are. In gambling. Wow. And is that, do you understand that as an implied term or an expressed term of the contract? I believe it's an implied term. I walk into the casino and I play a game and somehow the game violates the Casino Control Act. I can be sued for, and I do that, I can be sued for breach of contract? No. The question would become whether or not you are suing in order to correct what you feel was a violation of the act. Okay, if I did that then, but doesn't that then create a private cause of action under the Casino Control Regulations? It creates a private right of action. You argued that. The private right of action that I'm talking about in relation to this case is the Bregada suing Phil Ivey and Chang Young Son for the purpose of what it called an illegal game. The Bregada main thing. I'm just saying, at page 21 of your brief, you said, the blue brief, it says it's attempting to create, to say that there can be a contract action is attempting to create a private cause of action. And you said on page 20, the law doesn't engraft common law contract rules on games of chance. It's just in your brief. I'm just very curious as to your change of view. Well, Judge, I don't believe I'm changing view. I believe what I'm saying is this. I'm saying, obviously, in the context of a casino game, it is a contract. But what I'm also saying, the parties are not free to contract to whatever degree they wish on the terms of that contract. The contractual terms governing gambling are pre-set. And the contractual terms pre-set are the rules of the game. Me and you cannot simply agree, as Bregada and Ivey agreed here, to play this game with only eight decks of purple cards and use an automatic shuffling machine. All right, that's a different issue. You're now getting into the authorization of the case. But, I mean, when I have a contract, I contract with reference to existing rules. Obviously, if I'm doing something that renders what I'm doing invalid by law. But the fact that you're saying that these rules are incorporated as part of the contract is news to me. Well, I'm simply saying what I think the statute says, which is if a game is going to be authorized in the state of New Jersey on an exception to the general rule of illegality, the game itself must be an authorized game and the game must be played in an authorized manner. All right, that's a different issue. And then you're saying this wasn't played in an authorized manner because they used eight decks when they're supposed to use 12 and, therefore, there's a statute of limitations of six months. Is that where you're going with this? That's where I'm going with this. I'm going with this the same place the golden nugget versus Jomenko went. Because the way that one must analyze the events and what happened with regard to the, quote, breach of contract here is really what was the regulation at issue. And in this case, the regulation at issue is plain and clear. In that regulation, it says shall. It says shall when you're using an automatic shuffle machine. There's no dispute of the facts. The facts here are quite simply Phil Ivey requested, Borgata agreed. There's only one licensee in that equation. The licensee was the Borgata. The Borgata was required to follow the regulation of the game with regard to mini-Bachrock, clearly an authorized game, but that regulation required particular terms and conditions that simply were not met. And the particular terms and conditions are they were supposed to not only be 12 decks of cards, it was supposed to be different colors and batches. But these are the terms you requested, correct? They were terms that Ivey requested, yes. So you created a contract. But can I just pause for a moment? Who are the parties to this contract? Who are the parties? Yeah. The Borgata, Ivey, and Sun. Oh, so Sun is, Sun's a party to it. Yes, sir. Great. So I. Is she wagering? Yeah. She was wagering. She wasn't identified at the time you made the request, but your argument is she's part of the contract. Great. So you guys have a contract that included the terms of the Casino Control Act because they're implied into every contract that touches upon the subject of gaming. And then you offer terms that were inconsistent with the Casino Control Act, and that's what leads to the statute of limitations problem. Well, that's exactly what happened. Whether or not Phil Ivey knew the particular regulation governing mini-Bachrock and the number of decks required, I don't know. He was never asked that question. What I do know is Borgata knew, and what I do know is the regulation itself was published. Now, there's a provision under 1369F-8.3 that a casino may modify the terms if certain conditions are met, if they post a sign at the gaming table, announce the rule change, notify the division of the rule change. Do we know whether any of those things occurred, or do we need to remand to determine that? None of those things occurred. I guess we'll hear from the Borgata if they contend that any of them were. Right. As far as the record is concerned, as the Court knows, the Division of Gaming Enforcement investigated. Division of Gaming Enforcement reviewed what the Borgata had done, reviewed the game, reviewed the cards. There was never any finding by anybody, DG or otherwise, with regard to any request for modification. This was the parties themselves coming to an agreement, and the agreement, quite simply, violated the regulation and violated the rule of the game. How did they come to an agreement if, by your construction, it's not clear what Phil Ivey knew, it's not clear what Borgata knew, how is there a meeting of minds then, and then do we need to remand this for additional fact findings if we determine what the meets and bounds of this contract were before we made a decision? Judge, I believe the testimony was clear at depositions to what Phil Ivey knew. He wasn't asked whether he realized there was a particular rule and reg on a number of decks for the card. All he knew was these were the conditions he wanted in order to come to the Borgata and play and put up a million dollars in front money. And Borgata didn't say, oh, we can't do that, we have to play the 12 decks? They didn't say anything. What they said was, okay, great, just give us a million dollars in front money. So the point, I believe, and the point that I believe where the district court erred was, the question in the first instance becomes whether or not the game itself was an authorized and legal game. And what we're talking about really is a directive of the New Jersey legislature. As the Golden Nugget Court said, the statute 512.124 says, the provisions of 2A40-1 shall not apply to any person who has a licensee operating pursuant to the provisions of the act or is a player in any game authorized pursuant to the provisions of the act engages in gaming as authorized herein. And what those two parts of the statute are essentially saying is not only must the game be authorized, but the play must be. And clearly here the play was not. Let's say we set aside the statute of limitations issue and concluding, for example, that either it was authorized modification or that the regulations can be read to, so that if the game is authorized, the licensee is authorized, that that's all that's required. Modifications at the request of a player don't render play at that point unauthorized. The contract itself, you focused on the term of incorporation of the CCA and seem to be debating whether the CCA itself in fact prohibited edge sorting. But if we're really looking at a breach of contract, then isn't the question not what the CCA in fact covers, but what the parties understand is allowed or not allowed as a as a term and condition of the contract. In other words, isn't the question whether both sides understood that edge sorting was prohibited, regardless of whether it's covered under the CCA or not? I don't think there's even a question about what both sides understood about edge sorting. Although the complaint alleges that edge sorting was illegal and there's some illegality of purpose, the fact of the matter is every single Borgata witness to testify from the vice president of gaming to the security official himself all say edge sorting was legal. So the question of whether or not the technique of an advantage player in using edge sorting was legal, according to what the Borgata thought, there's no question whatsoever. Every witness said it is legal. There's no rule at all with regard to gaming and the regulations of the DGE that prevent a player from utilizing what is exquisite visual acuity in looking at and determining whether one card is of a particular value. You're going back to legality and what the CCA covers. My question is a little different. Yes. When we're looking at a contract, a breach of contract, we're looking at what was the meeting of the minds. What did the parties understand? And isn't the relevant question for us, if we get to the merits of the breach of contract, whether your clients understood that edge sorting was not permitted by the casino, that if the casino was aware they were engaged in edge sorting, that the game would be terminated  My clients did not understand that they'd be thrown out of the casino for edge sorting. But I believe you'd understand that. Yes. Then would you agree that there was a breach of contract? If they did understand that. I don't know that I can agree to that. This is the conceptual problem I have. So your clients then believed that edge sorting would be permitted if the casino was aware that they were engaged in edge sorting. Of course. Of course. Because as even the casino individuals testify, it is legal. There's no particular rule of the game. There's no house rule. There's no statute. There's no nothing that prohibits edge sorting.  But they could decide to stop the game. Absolutely. But that doesn't mean edge sorting is illegal. It simply means the casino is taking a countermeasure, which they're entitled to do. Same thing with card counting. Absolutely. Absolutely. But that issue of contract, the reason I'm having difficulty with that is, if I start with the proposition that we are not permitted in the state of New Jersey to contract with regard to illegal gaming, we're not permitted to contract with regard to gaming, period. You and I are not permitted to make a contract about gaming. Put aside legality or illegality. Let's assume that it's legal. Nonetheless, two parties with conduct that's legal can agree that it's not going to be conducted in a particular setting. Right? Yes. They could agree to that. Yes. So isn't the relevant question for us whether the parties agreed to that here, whether your clients' understanding and expectation of this contract was that they were not permitted, not because of the law, but because of their agreement with the casino. They weren't permitted to engage in edge sorting. Well, just based on the parties' agreement and their respective mindsets, I submit that neither party believed that edge sorting was illegal. That's not the question. Again, it's not about legal or illegal. Did they understand that a term of their agreement with the casino was that they couldn't engage in edge sorting? No. They did not understand that because neither party understood that. Well, how then do we understand the testimony by Sun, for example, that she didn't want the dealers to know why she was flipping cards in a certain way, and, of course, I didn't want them to know why because if they found out, then I can't play over there. Or Ivy's testimony that if they, the casino, know what you're doing, they'll kick you out. Right. In other words, they will do just as Judge Rendell indicated. They'll put a block on the shoe and you're done playing. They will exercise a countermeasure. There was absolutely nothing that prevented the Burgat at any point in time from stopping the game. But don't those statements indicate an understanding on the part of your clients that the casino, if they were aware that edge sorting was going on, would not permit it? Yes. They would take measures. So why isn't that then, if they had that understanding and, nonetheless, they engaged in the conduct they understood was impermissible in their agreement with the casino, why isn't that a breach of contract? Well, it's not conduct they understood was impermissible. It's conduct they believed was permissible, Burgat agreed was permissible, yet conduct where if they were to expose it and disclose it, the casino would say stop playing. The casino would take countermeasure against them. So it's not like they would be. Well, then it's not permissible to the casino, correct? The permissible part. The casino has the authority to take countermeasures with regard to any game. That doesn't mean the play is illegal. If it's aware of a condition being breached. But after it put its surveillance and its inspectors on many hours of play, they were not able to ascertain that was the case here. They were not. Isn't it like card counting? I believe it is. It's not illegal, but they take countermeasures. They can't prohibit it, but they can take countermeasures, such as putting the card in the shoe at a different location. So they'll take countermeasures. And here it would be that they would put something on the front of the shoe. Yes, that's exactly the point. It's not illegal. There's nothing about any of the actions undertaken with regard to head-swearing that make it illegal. Can I ask you a question about the RICO count? The district courts seem to think that there need to be fraud. But there are plenty of New Jersey statutes that prohibit cheating or intent to cheat or using devices separate and apart from the Casino Control Act. Was the district court correct in saying, well, there's no fraud, so RICO goes out the window? Well, I believe it is. I believe it was. The judge specifically mentioned that what was going on here, if anything, was a breach of contract, did not even rise to the level of fraud. And I believe he was saying that in the context of you can't establish a predicate act. There's no crime here. There's no actual misconduct that would qualify as a predicate act under RICO. But isn't a violation of the gambling laws explicitly listed as one of the predicate acts? If it's a crime. Here there wasn't. Here, in fact, there was no conduct which anyone ever has declared illegal. There's no violation of the reg. Was it cheating or swindling or knowingly by trick? By trick. That's the marking. That's the marking conclusion. Yes. Yes. I'm out of time. Good morning, Your Honors. May it please the Court. Jonathan Massey for the appellee, Borgata, which is also the cross-appellant here. Let me start with Judge Krause's question about what was the party's understanding and could there be a breach of contract. I mean, there is the separate argument about an implied term. But what did the parties understand? I think here it's clear that the parties knew that any reasonable person with the objective test, that the edge sorting would not be permissible. Permissible. Not be permissible. That Borgata would take countermeasures to prevent it. Well, beyond that, that that is antithetical to the game of Baccarat. Card counting occurs in games like poker and blackjack where there is this element of strategy and skill. Baccarat is glorified coin flipping. I mean, not to disparage my client's business. But in Baccarat, every card, the rules determine drawing of every card. There's no choice. Well, here, there was a skill, a visual acuity that is very unusual, but it's for free country. Everybody can do it. In gaining first card knowledge, which is antithetical to Baccarat, because the idea is that the random delivery of the cards is inherent in the game of Baccarat. The only choice somebody makes in Baccarat is to decide where to bet and how much. There's no issue about drawing additional cards. There's something called a third card rule, but that's not a choice by any of the players. The rules determine when every card is drawn. So if Phil Ivey had gone in the night before. Excuse me. Where did the term edge sorting come from? That's a colloquial. Borgata had never heard of edge sorting, frankly, before this case. It was not something that is commonly practiced. That's in the record at 502 and 503 of the appendix. Sun was the first person to come up with edge sorting. That's in Supplemental Appendix 89. So this is something that's new. And in the Crockford's case, in the English case, that explained why edge sorting is different from card counting, the way it came up in Crockford's is somebody in the casino, and this is in the opinion, this is in the appendix, remembered his grandfather doing a similar trick and persuaded everybody at the casino that what had gone on was edge sorting. And so if Phil Ivey had gone in the night before, covertly somehow gained access to the shoe and turned every card by hand and then was able to execute the scheme the next day, I think everyone would say that's obviously cheating and impermissible or breach of contract. What happened here was that they managed to enlist an unknowing, unwitting accomplice to turn the cards, and that doesn't change the result, that still the conduct both breached an implied term and breached the party's understanding of what was going to happen because that is the nature of back right. It's not like poker. It's like coin flipping with a rigged coin. If Borgata is an accomplice with as much access to knowledge about this as anyone, nothing was hidden, why isn't Borgata barred from saying you did this and you shouldn't have? Borgata is the one who agreed. We did agree, we did agree, but because we agree to lots of things that don't affect the integrity of the game. There's a lot of superstition surrounding back right which they exploited precisely because it's really kind of a passive game. It's coin flipping, and so we allow people to peek at the card before it's turned over. But nothing was hidden from you. You had just as much access to what was going on as anybody. It wasn't really in plain view because no one had ever seen it before. The testimony wasn't that everyone testified that it was lawful. Your Honor is right that they were talking about could you identify specific DGE reg, and they couldn't, but they said no, this is not something which has been done before. Yes, it's a skill, but frankly under the sentencing guidelines, skills are usually a ground for sentence enhancement. Cheating may be clever, but it's still cheating, and we acknowledge that. How are they cheating? You could have easily put a cover on the shoe because she's doing this and turning the card, good card, bad card. You had to figure out and was winning. You had to figure out there was something going on here. The way the district court framed it, which was to look at the text of section 115, was to say that card marking tends to alter the random selection of characteristics, the normal selection of characteristics of the game. Well, but then what's the end of that? So that person knows it and no one else does, correct? Correct, but that's always the case with card marking. If I took a magic marker and wrote on a card, it wouldn't change the order in which the cards were dealt, but it would give me, sorry. Yeah, these cards weren't marked. Well, the issue was, was the turning of the card to allow Son to identify the asymmetry, that was a marking that allowed her, it's true, nobody else had that visual acuity. But it has to be in a way that is not known by anyone else or could not be known by anyone else,  Well, I don't see that in the statute, Your Honor. Honestly, it says it altered the normal selection of characteristics of the game. And here it did, because it gave first card knowledge. And first card knowledge changes the game. It changes the game to one in which the casino has a slightly more than 1% chance of winning, to one in which the player has a 6.675% chance of winning. And so Ivy went 864 wins to 822 losses. Are you relying on the CCA as a term to make this argument, a term of the contract? We would say it's an implied term. It's what the district court said. It's what Judge Becker said in the Taj Mahal case. And that's what, you know, the Supreme Court said in Blaisdell, the old 1937 chestnut about the impairment of contracts clause, that there was the Minnesota Moratorium Act that was incorporated. We do think that's a proper way, the district court properly decided that. But then that means there's a private cause of action. Well, no, I mean, I don't think, I think Campione is pretty clear that common law survives the CCA. And the Toews case, also by this court, indicates that the common law survives the TCA. But I do think that if your Honor wants to say there's no contract at all, then you reach the same result. The district court here did not impose expectancy damages. It just restored the parties to the status quo ante. And in the complaint, which the district court didn't reach certain counts of the complaint, the equitable counts about mistake, rescission, all of the, erase the contract from the beginning claims. And in footnote 84 of our brief, we preserve the argument that if you want, that we should be, if there's any issue on appeal about the contract claim, then we preserve all the equitable claims. And I think the district court would reach exactly the same results. Does your breach of contract claim depend on us agreeing that there was a violation of the CCA? Well, no, I don't. Because I think your Honor has identified the party's understanding as a separate basis. I think the contract includes both an implied term and the party's understanding. If the question is the party's understanding, then isn't there a need for further, there are material disputes as to the party's respective understandings and expectations. Wouldn't that be a trial issue? Well, the district court didn't consider that. And whether it's a trial or a summary judgment issue, I don't know. But if your Honors think that the implied, the district court relied on an implied term theory, if your Honors think that the party's understanding is a necessary issue in the case, then yes, there would have to be a remand for the district court to examine that issue. And, but we don't think you should. We think that either you should affirm on the grounds stated by the district court, or you could affirm on the grounds that if there were no contract at all, there are equitable claims which lead to exactly the same result. Because the district court applied a rescission remedy, which is exactly the remedy you would get under, like, Section 377 of the Restatement of Contracts. It's exactly the remedy you would get if the contract never existed, if there were some invalidity. Why aren't you barred because the game was unauthorized under Golden Nugget? Right, let's go to that. Golden Nugget had, I mean, aside, you know, it's a decision. It's a nonpublished decision by a single judge, and I don't think it's binding on the court. But at page 328 of the appendix, in Golden Nugget, DGE issued a letter saying that Jamaica violated the regs in Golden Nugget. Here, there's been no action by DGE. In fact, as my friend on the other side pointed out, they looked very closely. Not just at Ivey's contract, but at Borgata's contract. And that's at page 115. Why does it matter if the regulation says that they must use 12 decks of cards? Well, because they have a primary jurisdiction, as your honors have asked about, to look at the regs. And there's the provision that your honors mentioned about DGE authority. There's another section of the administrative code. It's 13 colon 69 dash 1.3D. In special cases and for good cause shown, DGE may relax or permit deviations from the rules. And so they looked at this very closely. And they may well have said that, yes, the reg talks about 12 decks in two shoes. Here, there were eight decks in one shoe. And that's what the parties requested and agreed to. That is – we don't think that that's a material issue. You're pointing to the review after the fact. They did. But I think the question is about whether there was authorization to make these modifications before they were made and whether there was compliance with other conditions like posting signs, for example. Right. And we can't verify that any of those things happened. But we do know that DGE and the state police both looked at the time, you know, immediately after the incident. You can't verify because that's another fact question? Or you can't verify because you can represent it didn't happen? I can't represent one way or the other whether it happened or not. What happened is because this case was litigated on the assumption that there was compliance with all the regulations, I mean, the plaintiffs have said over and over again that there was compliance on Borgata's part with the regs. Like at page 8 of their reply brief in this court, the plaintiffs say – or I'm sorry, the defendants say it's undisputed that each and every one of the specific terms of the conditions of the play is lawful. There is no DGE rule or regulation which prohibits any of the terms or conditions, including relating to a particular color and number of decks of cards. There is no rule or regulation making any of it independently or in combination unlawful. So in the district court, they said the same thing over and over again. And we can submit a letter if you want to see that. But the issue is because the district court framed the case under the adversary system, the plaintiffs were – I mean, Mr. Ivey was not raising illegality as a defense under the reg. So it never got litigated. There was no discovery. There's no decision in the district court or briefing on the issue of compliance with the regulation. And we don't think, frankly, that the court should be deciding for itself whether there was compliance for the reg because there are lots of – there are hundreds of pages of regs. In Baccarat, for example, the first person to the table gets to inspect the cards. Not the second, not the third, but the first. And so if you were to say that a compliance with a reg means that gaming is unauthorized and that there will be a cause of action for a return of losses, then anybody who loses at Baccarat will be able to go to court and say, I was the first person at the table. I beat that person by 1.2 seconds. The game is unauthorized. I want my losses back. And by the way, I – To rely on the CCA in order to prove that there was a breach of the contract or some sort of unlawful entity. I mean, it does sound like you're trying to have it both ways, right? Well, I think we're only having it both ways because I think Judge Krause has explained correctly that the party's understanding is also relevant. The district court saw this as an implied term and condition case and used the CCA to find a breach. And we defend that. We think the district court was correct. But there's also the issue of what did the parties understand. And I think that it's clear that the parties, that any reasonable person would have understood that there couldn't be edge sorting because it's antithetical to the nature of Baccarat. It's different from poker and that the active – and also this was an active – well, whatever. There are a lot of differences between edge sorting and card counting. That's not relevant to your question. But as Judge Krause pointed out, we don't have the facts that support exactly what the terms of the contract were and whether everybody had this understanding. But, you know, we have this case because the Casino Control Commission has said, you guys go for it. We're supposed to be the authorities, but we don't want to talk about this. And we have a lot of ways we could go that could impact the industry in New Jersey. The only real case that helps us decide what to do in this case is Golden Nugget, which says specifically that an unauthorized game – and there it was a matter of whether they'd been shuffled. Well, you wouldn't think that that's a huge deal. But it was, and they said it was unauthorized. Doesn't that dictate to us that we need to look at this with respect to the cards that were – the number of decks? Or maybe certify this issue of whether the fact that you played with 8 versus 12 decks means it was unauthorized and therefore the statute of limitation applies. I mean, under New Jersey law, it looks like this case shouldn't survive a motion to dismiss the statute of limitations. Well, I have some more answers to the statute of limitations, and I will get to you. But let me address your question about Golden Nugget. I mean, as I said, Golden Nugget DGE had spoken. They had said that Jamaica violated the regs, and there was a finding. That is different from this case where DGE looked and did not find that. And I think that your honors should not tread and find a violation where DGE has not. But it's pretty clear under the regs that it's a violation of the regs. Well, but again, DGE has authority to decide whether to relax or to apply the rules. After the fact? Even after the fact. What's the authority for that? Well, I think the reg that I cited in the code talks about they may relax or permit deviations from the rules. If they're asked, but you didn't even ask and you're supposed to notify if you change the game, you have to notify the division of the rule change, the gaming table, where it will be implemented and the time that it will become effective. Well, that's one provision. There are other, I don't think the provision I cited. Can you cite that again? Give me that cite again. Sure. It's 1369-1.3D. 69F-1.3. No, I'm sorry. It's 69-1.3D. I can submit it in a letter if that would be easier. But my point is that let's go back to the DGE's jurisdiction. If your honors think the courts would be deciding this, then, as I pointed out, background cases will become anyone from Philly who goes to Atlantic City will claim diversity of citizenship and you're going to have a lot of federal cases saying this rule, this gaming law. That's why the Casino Control Commission should have spoken on this issue and they're putting it in our laps. What are we to do? Well, I think you should say because they found no violation and because the plaintiffs, frankly, have waived the issue, we're not going to even reach whether there was a regulatory violation. How could it be that under New Jersey law that they would be looking to an after-the-fact determination about whether something was authorized or unauthorized by an examination by the DGE to determine whether a six-month statute of limitations applied, presumably at that point, retroactively? Well, no. At the time of the incident, they immediately investigated. They're able at that point to say whether there's a violation or not. They're not acting. DGE acts to administratively enforce its own regs for its own purposes. I don't think they're thinking too much about, well, plaintiffs, six months and all of that. Their job is to make sure that casinos are safe and reputable and promote the purposes of the whole casino legalization, which is to ensure that there's safe, proper gaming in New Jersey. And so that's their administrative authority. And I do think separately that the notion that a game is suddenly unauthorized because there's a violation of a reg that's one hyper-technical detail in a large set of hundreds of pages of regs, I think is a misreading of the statutory scheme. I mean, my friend on the other side referred to Section 124, which exempts the casino industry in general from the criminal prohibitions against gaming. And both the New Jersey courts and this court have read that as a categorical exemption. Like, if you look at Miller against Zobey, that's a case where the appellate division encountered an alleged violation of the CCA. It was a casino junket operator who allegedly loaned somebody money, gave somebody cash in violation of the CCA. And Miller v. Zobey did not say, therefore, there's violation, therefore, everything was unauthorized, therefore, there's a six-month statute of limitations. Miller v. Zobey said the opposite. It said that the six-month statute does not apply because the CCA, quote, specifically exempts casino licensees and players from the statutes declaring gaming transactions unlawful and inferentially exempts casinos from Section 5, permitting an action by a loser to recover property within six months. Well, then all the more reason for us to certify the issue because that goes against what Golden Nugget says. Well, of course, Golden Nugget is an unpublished decision. And Miller v. Zobey is in the appellate division. Well, that's an eerie guess, I think. You can say I follow the appellate division. And this court has already crossed that bridge, frankly. In the Toews case, Judge Greenberg's opinion, that involved a gambler who, again, alleged a violation of a reg that he had been served while visibly intoxicated. And he alleged a counterclaim. And this court did not say, oh, everything's unauthorized and you have six months. It gave him six years. It gave him a six-year common law statute of limitations rather than six months. And so both this court and the New Jersey appellate courts have looked at this as a categorical matter. That wasn't a violation of a regulation. Yes. Leonard Toews cited a violation of a regulation to say that he was served while visibly intoxicated. It was premised on both a common law duty, but he also cited a regulation. Otherwise, look, every technical violation is going to lead to chaos if that's the rule. Because in blackjack, you have to cut the cards at least ten cards from the end. If somebody cuts it nine cards at the end, does that mean that there's going to be a federal case? It can't work. Why is it chaos? Why doesn't it just mean that a six-month statute of limitation applies if the casino engages in unauthorized play, in violation of the rules, and then the casino is turning around and asking for rescission? I think if you void the case, if you void the contract, then you lead exactly where we wound up here, which is to rescission. We can live with that remedy, which is to say. Within six months for an unauthorized game. Well, no, I don't think it's within six months because I think the rule would be if there is a violation of a reg, the transaction is void, the contract is void. That's what Section 3 says, 40-3. It says if there's been a legal gambling transaction, a contract or agreement is void and of no effect. And so if that were the rule here, if the argument were Borgata should have gambled with, should have provided two shoes with six decks each, everything was void. But doesn't 40-5 make an exception to that? It provides that even if it's unauthorized play, that is reverting back to the illegality of that gambling, that you can bring an action, you know, a person who lost money can sue for and recover such money in a civil action, as long as they do so within six months. It does say that. It doesn't say that it displaces all rules of equity. It doesn't say that it is the exclusive remedy. Even if you viewed it as a remedy, it clearly is a cause of action. I don't deny that. But if there's another provision of the same statute which says, well, the agreements are just going to be void, then that allows someone to bring causes of action based on equity. And frankly, in Golden Nugget, if you look at page 345 of the appendix, which has the Golden Nugget decision, Golden Nugget just doesn't bother, actually doesn't cite the six-month provision. How is 40-5 limited by its terms to breach of contract action versus equitable actions? It says, if a person shall lose such money in violation of 40-1 of this title, such person may sue for and recover such money in a civil action. Right. No, I'm saying it's not limited. It doesn't displace. My point is it does not displace any other equitable remedy. No, but it imposes a limitations period of six months. For that cause of action. So why isn't the Borgata's action then time barred? Because we're not suing under that provision. If you were to say that everything is void and the party should be left to equitable remedies, then I don't think you can read Section 5 as precluding a simple rescission action under the restatement. And those are the, at the very least, those are the claims that exist now in the district court. If your honor had that concern, I think the proper answer would be to remand for the district court to let the district court in the first instance decide whether the equitable claims survive. And then RICO claims, frankly, RICO claims RICO is a totally separate cause of action. The RICO applies to impromptu games outside of the casino, completely unauthorized games. There's a case we cite in the brief called Joseph from the Sixth Circuit, which is a case about just impromptu card games outside the casino. No authorization of any kind. And you can get RICO claims out of those. So both the RICO claims and potential equity claims are separate from the cause of action that your honor identified. How do any allegations you've made, what's been developed so far, reflect the existence of an enterprise? Do they, what about the existence of the enterprise? How do your, the allegations in the complaint, how have they been developed in the record thus far reflect the existence of an enterprise? Well, right, New Jersey they don't because New Jersey doesn't have the distinctiveness requirement. But the enterprise that we alleged was an enterprise, in fact, involving the combination of Ivy and Sun. That the two of them together, the whole was greater than the sum of the parts. That Ivy was able to bring a VIP status and demand conditions, which no other gambler would have been able to get or very few gamblers would be able to obtain. And Sun brought these skills. And so the two of them together were an enterprise beyond each of them as defendants. We admit that under the federal law, Cedric Kushner, the enterprise and the defendants have to be distinct. They don't have to be distinct under New Jersey law. So you're abandoning then a federal RICO action? No, I'm not abandoning it. I'm saying, in fact, I was trying to explain why. Because the whole is greater than the sum of the parts, the enterprise can exist even though it is composed of the two defendants. That the federal, Cedric Kushner says you generally have to allege an enterprise that's more than the defendants. And I think we've done that here by saying each of them, there was a synergy between the two and each of them brought things to the table. That's my point on enterprise. How about on damages, you argue that the comps should be included and that was another area you claim in the district court's decision. Why wasn't the district court correct that comps are simply a gift? There's not an expectation that they would be returned under any conditions. Right. We weren't saying it was part of the contract that way. We weren't saying that he breached a specific contract with regard to the comps. It's that in unwinding the events, you would also return the comps. I mean, Ivy also got some money from winning craps. And the district court awarded that to us as a refund because it said, look, we've got to imagine that this whole episode never happened. Because that was the way the district court lended the remedy. And so if under that world, under that counterfactual of restoring the status quo ante, we wouldn't have paid for his hotel and all the meals. That's just our argument on comps is that it's simply a way of it seemed like a further proper application of the district court's own damages remedy. And so I think I do think that we, you know, I hope I answered this specific question that your honors had. I do think that the that as the case was litigated, as it comes to this court under the district court's theory and the district court's decision, that it should be affirmed that clearly the way the district court addressed the case, especially given the plaintiff's concessions below that they that they reg was the board of Borgata complied with the reg, that it would be somewhat, you know, the district court should at least have the opportunity to examine that issue before your honors make a conclusion about the violation or non-violation of the reg. I just want to go back to the nature of the contract and the terms that you're asking us to imply in the contract. Can you just give us a clear answer? Is the argument that there was an understanding that this that the CCA was a term of the contract and the breach is the violation of the CCA? Or is the CCA not relevant? And the argument is that there was an expectation, a term of the contract that edge sorting was not permitted and engaging in edge sorting constituted the breach of contract. Right. I think our answer would be there was an implied term containing the CCA that agree agreeing to play in conformance with New Jersey law. I think my friend on the other side said is an implied term of the contract. That's what what the way the district court saw it and the way Judge Becker saw it in the Taj Mahal case. And that is one basis for breach of contract. There is a second basis for breach of contract based on what a reasonable person would have understood the nature of and therefore the party's understandings based on edge sorting. Which did you claim in the complaint? We just claimed breach of contract. The implied contract provision was is something which came, you know, came later. The complaint contains a breach of contract claim as well as equitable claims that I mentioned before, as well as RICO. But I don't think the complaint is in any way limited to an implied term theory. About your theory of summary judgment. I think the. I think the clearly the argument of summary judgment was that the nature of the game of Baccarat is inconsistent with any edge sorting. The Baccarat, by its nature, is a random game like roulette or flipping coins. It's not a game that would permit edge sorting because edge sorting gives first card knowledge, which is antithetical to the basic principles of Baccarat. So these aren't sort of a clear new language. These aren't creatures of nature. They're creatures of regulation. Baccarat doesn't exist, but for the DG and the legislature creating a casino control act. So maybe we go back to a question we asked your adversary earlier. Is it your position now that the CCA is an implied term of gaming in every relationship that a casino has with one of its customers? Well, certainly in this relationship, every every I think it's implied by law. I mean, that's what my friend on the other side said in Golden Nugget. 596 of the appendix, the implied contract between the parties included by legal necessity, the terms and conditions which are required under New Jersey law. But let me also say that the party's understanding of Baccarat is informed by things like even the English court understood this was cheating. Foxwood casinos in Connecticut understood this was cheating because not because they operated in New Jersey law, but because they understood the nature of the game of Baccarat. And so I do think that there is a separate argument based on any sort of the party's understanding premised on the nature of the game. When you walk into a casino to play Baccarat, you are you are agreeing to a situation where you will not have first card knowledge. And anyone who thinks otherwise has is operating under a unilateral mistake. And of course, that wouldn't void a contract either. In other words, if I walk into a casino with the mistaken understanding that I could cheat at Baccarat or Blackjack or anything, that's not going to be voiding. I mean, that's not a basis for me later to retreat and claim I'm not contractually bound to observe that. Right. That unilateral mistakes do not void contracts. Looking at your amended complaint, it seems on its face to be clear the theory of the case is a violation of the CCA. It is some other understanding of the parties. Well, I think it alleges breach of contract based on this debate. And it does refer to the CCA. But my point is that completely. Well, I think it also talks about the nature of Baccarat and the cheating inherent in any scheme which gives someone first card knowledge of Baccarat. And so that, I think, is a sufficient basis, or at least if your honors, if the issue is, does the complaint include that theory? Then I think the district court is the one to resolve that. But I do think that the way the case was litigated was that the that Baccarat is inherently a game of chance. It is not a game of strategy or skill. And so therefore, any any patron who thinks otherwise is playing something that's not Baccarat. So you're relying for that on 115A too? No, that theory I I'm relying on. That's the card marking statute. No, I think that the idea of the party's understanding or what the nature of the game of Baccarat is, is separate from the CCA. I think that's an argument that would just say first card knowledge is antithetical to the game of Baccarat. Anyone who seeks and obtains first card knowledge is not playing Baccarat. It's commonly understood of the party's knowledge. That's a contract. I understand your argument on the CCA. That's positive law coming from regulation. This nature of thing that you keep referencing. Can you help me understand what that is and where that informs our our understanding of this? Well, I was trying to couple it to Judge Krause's point about what did the parties understand? What did a reasonable person understand when when walking into a casino and saying, let's play Baccarat and let's play according to my specific requests? I think that a reasonable person in that situation should know that that he or she will not be allowed to edge sort. That edge sorting is not part of the game of Baccarat because that is a there's a whole custom and an understanding of what Baccarat is. The way that if I walked in and said I have tennis rackets, that that's not part of the game. And that's my point, that the party's understanding could be seen as a breach of contract theory separate from implied contract. We don't we don't we're not running from the district court's implied contract theory. It's just that today, I think Judge Krause did articulate an alternative view about what did the parties understand. And I'm saying we need that, too. So you're arguing, in other words, that the the the parties under regardless of what the CCA actually prohibits, the party's understanding of what the CCA prohibited is what's relevant for a breach of contract claim. Correct. Correct. And what a reasonable person would have understood. I think that's always the contract to the extent that your your theory does turn on a violation of CCA. Are you arguing that it was unlawful based on a two? That is the altering normal random selection characteristics or normal game of chance or under one 15 B marking provision. Right. I think both, because one A2 refers to, you know, any cards which have been marked or tampered with or placed in a condition or operated, blah, blah, blah, which tends to result to which tends to alter the normal random selection of characteristics. I think that was met here. And then B, as you would point out, prohibits you knowingly using any marked cards. So I think both of them were violated here. So what one possible reading is that A applies to prohibitions on the casino and B on the player. Do you have any authority that one 15 A applies to players? Well, because it applies to not simply things that that that a casino does like deal, but carry on. I think the patron carries on as well as the casino. And if the for the patron to and also exposes for play, those are both things which the which which a patron does as well as the casino. Do you have any authority, any case law from New Jersey that applies one 15 A to an individual player? I have not looked for your honor. And with your permission, if I look and find some way, I send a letter. Well, we'll take it on that if you find. OK, thank you. And of course, counsel could respond if such a submission is rendered. Other questions. OK, thank you. Thank you. Your Honor, as I wish to respond primarily to this in the course of the argument, there was talk about the D.G.E. whether this court should send back and let the commission or the Division of Gaming Enforcement make the decision. My adversary also indicated that in Golden Nugget, the difference was there was an actual decision by the D.G.E. The fact of the matter was there was a letter from the Division of Gaming Enforcement's lawyer that was part of the Golden Nugget case. However, the court ruled that that was not a decision of the agency. It was the opinion only of a lawyer and did not accept that it was absolutely irrelevant. But more importantly, what the Golden Nugget court found was, look, the events that occurred here were more than two and a half years ago. The Division of Gaming Enforcement investigated it and that was it. Nothing further happened. If the court must act and likewise here in this instance, these events happened in 2012 and there's not one event. There are four different events between Ivy and the Borgata over a period of months from April to October. The point, of course, is the investigation occurred, the D.G.E. acted and did nothing. The D.G.E. knew the issues. The D.G.E. understood that the dispute between the parties involved the issue of edge sorting. Yet they did nothing. So the fact that they did nothing means, I respectfully submit, it is time for the court to do something. Where is there any allegation or any evidence that the casino understood that your clients were engaged in edge sorting? Isn't it the opposite? I'm not saying they understood it. What I do say is on the first order of play with Phil Ivy, the surveillance department suspected that he had first card knowledge. It was part of the hot sheets within the casino surveillance system. So the casino suspected Ivy had first hand knowledge, which is what they argue in this case, that by virtue of the edge sorting technique, the defendants gained first card knowledge, thereby enhancing their ability to make good decisions and good bets. And they concluded after that evaluation that it wasn't the case or they couldn't verify it at that time. They did. That is what they concluded. And that's where it ended. So I'm not understanding then what significance that has in terms of the expectation of the casino. Well, I'm not saying it has any with regard to the casino's expectation. What I'm saying is what I was saying was the fact that the DG investigated is significant. The DG didn't do anything further when it comes to interpretation of what happened here, interpretation of the rules and regs of the game. There's no reason to send it back to the DG. The whole concept of the Casino Control Act is this is a strictly regulated business, which is governed by rule and regulation. The rules and regulations are in black and white. There's nothing to send back. There's no opinion the DG can give that varies from the regulations that were in place. That is my point. I think the question raised was not so much as sending it back to them as we've offered that up. And the commission and the attorney general's office have clearly declined. But rather, whether given that these are state law questions and if there's lack of clarity and significance to the state, depending on how we would come out on them, whether it's something that should be certified to the New Jersey Supreme Court. Well, I understand. And what I want to say finally for the court is the issue of edge sorting has been called a scheme, has been called a act of criminal conduct, the illegality of purpose. All of the Borgata's allegations and its complaints, the court just indicated, all involve violations of the Casino Control Act. Judge Rendell asked, well, then how are you claiming? And our claim was and our defense here was, in part, they are seeking a private cause of action based upon a violation of the Casino Control Act. That was the second issue raised to this court on appeal. And it was the issue raised to the district court in summary judgment. And that's precisely what they're doing. But the campion New Jersey Supreme Court has already said that they can do that. Right. It says that the legislature did not intend the CCA to prevent patrons from seeking vindication of common law claims in the courts. Yes. But this campion did bar private enforcement of the Casino Control Act. So I'm not arguing it's not a fine distinction, but it's a real distinction because the arguments in the plaintiff's complaint are all focusing upon violations of the Casino Control Act. Enforcement of the act. They're bringing common law claims that may depend in part on that being an implied term, for example. But whether the claim they're bringing is a common law claim, it's not stepping into the shoes of a commission trying to enforce the act per se. Yes. Right. Yep. And so how given that the New Jersey courts have seemed to recognize an implied contract action as something cognizable under New Jersey law, how could we accept your argument that there can be no contract action if it turns on a breach of regulations? The issue of a contract action falls like this, at least in my opinion. The game, while it contains a requirement that both sides operate pursuant to the rules of the game, if that game in and of itself is unauthorized by the rules and regulations, there's a remedy. The remedy is 2A40-1. However, if that is applicable and there's been a violation of the authorized rules and regulations, we are not permitted to enforce a contract. How can we bring a contract claim that is in essence in violation of New Jersey public policy? Because the claim there would be the terms and conditions we agreed on are a common law contract. They are independently enforceable. Those are the same terms and conditions that render the game unauthorized and illegal. You can't have a common law claim of contract where your underlying, quote, contract action has been based on an illegal agreement to gamble. That's my answer. Did you press that argument earlier in these proceedings? Because I'm not aware of where you've raised that specific argument that this entire contract was illegal. I believe it's point one of our brief talking about the fact that the entirety of the plaintiffs, that the action in this case must be dismissed because they're relying upon illegality in the conduct of the game. In the edge sort of. Yeah, yeah, yeah. Yes, sir. What about the arguments that. The game is illegal because of the casino exceeding to your client's requests and playing mini Baccarat contrary to the rules. Right. Figuring this six month statute of limitations. Well, did you raise that argument? Not specifically. No, not specifically did not. The argument was raised only in the context of violation of rule and regulation translates into unauthorized game, which is illegal. So in essence, whether in my mind, there are two paths to the same result. Path number one is what the court noticed in the clerk's notice. There's a particular rag on decks and colors of cards. Also, same result with regard to a finding of edge sorting. If the court found, as it did, that there was a marking that the game was illegal and the court said that and the court came back and looked at the district court gold nugget and said exactly the same thing as gold nugget said and accepted that reasoning because the illegality was at the inception. At the very beginning of this relationship, there was an agreement to commit an illegal act. Apparently, whether one looks at the regulations and the number of decks and cards required or whether or not there was edge sorting. And if that's the case, then the game as it began was unauthorized because it did not comply with the strict regulations in place. If that's the case, they had the remedy. The remedy was pursuant to the statute, not in a common law contract action. That's our argument. All right. Thank you to counsel for excellent argument and your stamina and persisting through a long argument at that. And we will take this case under advisement as well.